Good morning, Your Honors. Good morning. If it pleases the Court, my name is Christopher Winter, and I represent the plaintiffs' appellants, North Slope Borough and the Alaska Eskimo Whaling Commission. I'd like to reserve three minutes for rebuttal this morning. All right. I'd like to address two main issues for the Court. First, I'd like to clarify how the Minerals Management Service used the price of oil in this case to determine the environmental effects of the proposed lease sale, and I'll then discuss why MMS's refusal to update that information in the environmental assessment is arbitrary. Second, I'd like to discuss what MMS admitted was significant new information related to increased seismic activity and the threat posed to polar bears, and I'll discuss the alleged mitigation measures and why those measures are inadequate as a matter of law. First, with respect to the oil price claim, Your Honors, here the price of oil formed the very foundation of the environmental effects analysis in both the multi-sale environmental impact statement and the subsequent environmental assessment for lease sale 202. In the multi-sale EIS, MMS stated, and I'll quote from the record at page 303, factors such as the price of oil would have tremendous effects on the amount of oil and gas exploration and development. The price of oil dictates how much exploration and development activity will take place, and the predicted level of activity, therefore, determines the resulting environmental impact. Also, in an appendix to the EIS at page 317, MMS stated that the effects of petroleum development will be proportional to oil volumes produced. And MMS stated that higher prices support greater levels of activity and more resources discovered and developed. And in the EA itself, MMS again states that it considered the price of oil in determining the environmental effects of the proposed lease sale. So in sum, the price of oil determines how many wells will be drilled, what infrastructure will be built, where that infrastructure will be located, and how much oil will be produced, and therefore, what is the risk of multiple large oil spills. So the price of oil was used to predict the amount of activity in the affected area, right? Yes, Your Honor. So unless there were some indication that there was a drastic change in the amount of activity, would the price or price increase in and of itself, in your view, dictate supplementary environmental assessment or environmental impact statement? Yes, Your Honor. Our position is that for the Secretary to have made a rational decision on the environmental assessment for lease sale 202, he was required to consider an updated price of oil and to determine whether the environmental effects would therefore be significantly different after factoring that price of oil into the analysis. And here what the Secretary did is instead he chose not to consider a new price of oil. Now, are you saying the Secretary didn't even take a look at the fact that the price of oil had gone up? So in the multi-cell EIS, Your Honor, they started with the price of oil, and they used a method that they had developed previously to predict how much oil would be produced. Yes, so he did consider it, did he? Well, that was in the multi-cell EIS. But then moving forward, and that was done in 2001, moving forward to 2007, the Secretary recognized that there was an updated price of oil. It had gone up from $18 to $46 or perhaps $55 a barrel. But the Minerals Management Service- Well, that's on a particular date, I take it, but the average price had been, what, $28? The average price, well, in 2001, they predicted $18 a barrel. And then in 2006, MMS redid its analysis and used $46 a barrel in 2006. And then in 2007, we had the environmental assessment for resale 202, and they reverted back to the 2001 figures of $18 a barrel, even though they had already redone the analysis for the Beaufort area in 2006, a year before this environmental assessment, using their original methodology in 2001, and used the $46 per barrel price at that point. So then they moved forward a year and reverted back to 2001 figures. But didn't the service ultimately say that the long-term oil price average was a better indicator rather than the fluctuating up and down prices? And so isn't that the hard look that the service has to take? I mean, it doesn't have to come to the conclusion that you might think is appropriate. But didn't it consider whether or not it should adjust its estimates based on the higher oil price? And isn't that all that is required? So here, Your Honor, the Minerals Management Service recognized that the long-term price of oil had gone up. And they recognized that in 2006. I suppose you're answering her yes or no question, no. Are you? That's correct. So the Minerals Management Service did not determine that the long-term price of oil in 2007 was $26. They had already, in 2006, determined that an accurate price would be $46. When they went to value the lease sale for auction. As of what point? In 2006. In 2006. But weren't they looking at oil prices over a longer period of time as the gauge for whether or not there would be a substantial impact on the affected territory? So there is no evidence in the record to support. Yes or no? No. The record does not support the agency's conclusion that it used $26 as a long-term price. They cited simply to. But that was their conclusion. I mean, didn't the agency say that it was looking at long-term oil price average rather than the current price, the higher price? They set forth that conclusion at one point in the environmental assessment. And the record, however, does not support that conclusion. And it was done without any analysis. The only piece of data that they claimed to rely on for that conclusion was an article that was published in a newspaper that is not included in the record and was not presented to the public. So are you asserting a violation of NEPA or the Marine Mammals Protection Act? Or what is your bottom line argument regarding where the violations are? So the argument is a violation of the National Environmental Policy Act. And NEPA requires that the Minerals Management Service continue to update its analysis and look at new information as to whether the effects would be different from when it made its original decision. And in 2001, it issued an EIS for three lease sales. And it committed at that point, because the lease sales would be implemented over five to seven years, that before it issued the subsequent lease sales, it would update its analysis and make sure that its analysis was still accurate in 2001. And so our position is that the analysis that was done in 2007 is arbitrary because the Secretary refused to consider an updated price of oil in the same way that he had done in 2001 and 2006. But what requires that the same analysis be done in an update? What case are you relying upon to support your argument that the analysis must be the same? So it's not that the analysis must be the same, Your Honor, but it's that the analysis that was done by the Secretary was arbitrary because he refused to consider the evidence in the record that was relevant to the decision. And so – I thought you said that he did not consider the evidence – that it did not consider the evidence in the same way it had previously. Well, that's just one indication of the arbitrariness of the decision, Your Honor. So an agency has to explain why it's going to change course if it chooses to consider information using a completely different approach than it had previously. An agency must explain its decision to change course. And here the agency has not done that. But also the decision conflicts with all of the information in the record as to what the accurate price of oil was at that time in 2007. The other thing that I would like to discuss briefly is that the agency had concluded that even if it had used an updated price of oil, the analysis would not have changed. And they also did that without setting forth any analysis in the record. It was a conclusion unsupported by analysis. But the evidence suggests just the opposite. In 2001, the agency predicted at $18 a barrel that the resulting production would be 1.38 billion barrels of oil. And this is in the excerpt of record at page 303. Counsel, do you have the excerpts of record? Do you have supplemental excerpts of record, page 58? Okay, could you get it, please? I'm just trying to understand why this is not the hard look. This is the environmental assessment for 2006. What was that citation, Your Honor? It's page 58 of the supplemental excerpts of record, but it's like page 5 of the lease sale for 2002. Page 58, I'm sorry. 58 of the supplemental excerpts of record. Yes. Do you have that? Yes. Okay, explain to me, you know, the section that talks about 3B, potential scenario, where it talks about the price of oil and, you know, how they looked at the price, looked at the price of oil originally and why the estimates are still valid. Tell me why that doesn't meet the requirements that the service take a hard look at any new developments. Why doesn't that meet? Yes. So, Your Honor, what the Minerals Management Service was doing here is it was concluding with that analysis that it would not go back and look at an accurate price of oil. And so here where it says $26.81 per barrel and it cites to a news article, that article is not in the record. That information is not before the court or before the agency. What is in the record here is the agency's own analysis in 2006, which put the price of oil at $46 per barrel. That information in the record did not inform the agency's decision. And so the agency ignored that information in the record, and that's arbitrary. And the information is included in the record, in the excerpt of record at page 46. Now, also what was in the record was the agency's own determination when it valued the lease sale as to what the government would get in a fair return at $55 per barrel. So there were two other pieces of information in the record that suggested that the price of oil was much higher than what the agency had used in this analysis. And, in fact, the only information the agency claims to rely on is not in the record. And so that is why this decision is arbitrary. Now, there was the other piece of that, which is right below the discussion of price, is that it was optimistic. And as I was just stating earlier, in 2001 they predicted 1.36 billion barrels of oil at $18. In 2006 they predicted 4.12 billion barrels at $46 per barrel. And so by using an accurate price, the volume estimate increased by approximately 300%. And so that original analysis was not at all optimistic and, in fact, severely underestimated the potential development scenario. And so that conclusion, that it was optimistic enough to include the increased price, was not at all supported by the record. I'll save the rest of my time for a moment. Thank you. Thank you very much. Round turn. Good morning, Your Honors. My name is Tamara Roundtree and I represent the Minerals Management Service. Judge Rawlinson, you're absolutely correct. Page 58 is truly indicative of the nature of the hard look that the agency conducted for purposes of oil prices. On that page, the agency states that industry considers its investment projections by way of or in terms of long-term averages for the price of oil. In large part, as explained in the EA, industry does this because its oil development projects take place over decades. And so industry doesn't look at the price of oil at a given day or even a given year. It looks at longer-term ranges because oil prices are volatile. MMS indicated in the EA this was – it followed – well, because the EA was estimating the activities of industry, MMS would use the same sort of analysis that industry did. And, therefore, MMS looked at long-term average prices of oil, not at narrow ranges of oil prices at any given time. Counsel, what's your response to opposing counsel's objection that the newspaper article that's cited on page 58 is not in the record and, therefore, it was arbitrary for the service to rely upon that for an oil price average indicator? This reference to the article, it says the price of North Slope Alaska crude from 1996 to 2005 has averaged $26.81 a barrel. This is an estimate of an average – I believe it's just a statement of information that was concluded or included at this given time. But I don't believe these are the figures that MMS was – this is the figure that MMS necessarily relied on. What it relied on more specifically was a larger range of long-term averages. And in – But how could it have – I mean, what would it rely upon to determine or to ascertain what those long-term averages were? I mean, that's counsel's argument is that you just plucked the figure out of the air without referring back to any documents that were in the record. Well, no, I don't think it was plucked out of the air. And I apologize. I don't know exactly the nature of this article. What I do know is that the figure that MMS ultimately used was one that was based on industries – on the long-term averages, which is what industry uses. But the more – Where is that set forth in the environmental assessment? That being – The long-term figure and the basis for it. Where is that – where can we find that in the record? Well, the fact that this actual article – and I don't know specifically if it isn't actually in the record, but the fact that the agency relied on it here in the EA, the fact that the actual paper isn't necessarily here and it might be in with the appendices, it indicates, though, that this is a figure that the agency did rely on. But if the Court would take note, this amount of $26.81 falls within the range that MMS did look at. And if you look a few sentences up, it says that a future oil price range of $18 to $30 per barrel was considered by the agency. And so the $26 falls within the range that the agency actually looked at. And the agency also makes the point in the EA, though, that the range that it looked at covers oil and gas activities that are more optimistic than history would have suggested. So even if we have what industry might look at at this corner, the agency is also concerned with the nature and extent of activities that has taken place over the past 30 years on the Outer Continental Shelf. And the agency determined that what it looked at in the original EIS was more optimistic than what history would have suggested. Now, an example of that is over the past 30 years, in the Outer Continental Shelf, on average, for each lease sale that was conducted, only four exploration wells were developed per lease sale. In the EIS, the estimates by MMS were 12 exploration wells per lease sale. That's three times more than history, being the past 30 years during which MMS has managed the Outer Continental Shelf. It's three times greater than history would have suggested. As for actual production wells, over the past 30 years, only one field has been developed for oil and gas exploration. But MMS predicted for these three lease sales that there would be six times that amount, that there would actually be six fields. So the estimates on which the original EIS were based were significantly greater than history projected, and they weren't tied to non-dynamic or static, if you will, oil prices. Now, one also on page 58 of the EA, it also states that the projections in the original EIS accounted for the fact that there may be increased oil and gas activity. The EIS wasn't meant to be static and only good for a limited amount of time. And it was in the EA that MMS said, given the broad nature of our analysis and the optimistic nature of our analysis in the EIS in the first instance, we are, if you will, to put it in informal terms, we're covered now three years later for the 2006 EA. We need not go back and reanalyze because the nature of our initial analysis covered the potential impacts that we deem might result from the activities that we've estimated from this particular lease sale. Now, as I would like to clarify, counsel's statement or attempt to impeach MMS's statement that its projections for lease sale, well, its projections in the EIS, I was incorrect, its projections in the EIS were not indeed optimistic. Now, this argument that Norsell puts forth is on page 11 of this reply brief, and I just offer you that because I don't want to take up the time to actually flesh out their argument. But they rely on two figures, one of which is found is 1.78 billion barrels. That's found in the excerpts of record on pages 3, 18, and 19. That figure correlates with a term called resource estimates. Resource estimates are MMS's predictions of the amount of oil that is undiscovered, is still in the subsurface, but it's the total amount of oil that's in the subsurface, undiscovered, and could be recovered but has not yet been. MMS conducts these estimates for given physical areas. The 1.78 billion barrels that Norsell relies on is for the largest planning, for the largest area that MMS looks at, and that's the planning area. So the 1.78 correlates to the Beaufort Sea planning area, and it's the amount of oil, the total amount of oil, that MMS believes is still in the subsurface and could be recovered. The other figure that Norsell relies on is a smaller figure. It's 1.38 billion barrels. That's MMS's estimate for the three lease sales that were at issue in the EIS, that being lease sale 186, 195, and 202. The 1.38 billion barrels was MMS's estimate for only those three sales, and it wasn't a resource estimate in its entirety, meaning MMS didn't make that prediction for those lease sales as a total inventory amount. Rather, if the court looks at page 303 of the record, you'll see that MMS was referring to the assumed – I just want to get the terminology right. That would be a subset of the – Exactly right. It was the amount assumed to be discovered and developed. So it wasn't a look at the total amount of oil in the area of the three lease sales. It was an estimate of the amount that MMS believed might actually be recovered. But the bottom line, Your Honor, is absolutely correct, that the 1.78 billion barrels is a much larger figure for a much larger physical area and therefore is not analogous and can't be compared to the 1.38 billion barrels. So Norslope's attempt to say that because we have one figure here that's larger than what MMS projected for the three sales means that the EIS was not optimistic, that is incorrect. In essence, it's an apples and oranges analysis that's improper, and I just wanted to clarify to the court that it doesn't at all impeach MMS's statement that its projections in the EIS were indeed optimistic. I'd just like to touch upon another point that's made in the reply brief, and I just want the court to not be misled, and that is to the impacts that MMS found with respect to polar bears. Norslope in its reply brief indicates that MMS found that there were significant impacts and that it had to rely on mitigation measures to bring the level of impact below that of significance. That's not the case. In the record, it indicates that MMS found that in the three years between the preparation of the EIS and the EA, there was no information that showed new significant impacts to polar bears that hadn't been analyzed. What the EA did point out, though, is that MMS had seen that there were potential impacts that were of increasing concern to the agency concerning polar bears. Because there were factors that presented an increasing concern, MMS deemed it appropriate to look at the existing mitigation measures that were already in place to see if they would address these potential risks to polar bears. Not impacts, but potential risks. So I just want to make certain that the court understands that the discussion of mitigation measures with respect to polar bears was not to bring impacts below the level of significance, which is the argument that Norslope makes in its reply brief. Counsel, could you address the dissension among the scientists in the review process? The overall nature of the disagreement regarded what was with respect to what was the proper population level that the agency should be addressing for purposes of its analysis in the EA for lease sale 202. Mr. Childs, the scientist, was of the opinion that the agency should be looking at impacts to local populations. And this is for the capelin and for pink salmon. MMS stated that for biological resources, for the large category of biological resources which included fishes, the proper population that MMS should be looking at in this large-scale analysis was regional populations. So the disagreement was, in essence, should we look at local populations or should we look at regional? Norslope actually contends that MMS completely ignored Mr. Childs' opinions about local populations being relevant. First, in the first instance, that's, well, first of all, that's incorrect. In the EA, it actually addresses the fact that there may be significant impacts to local populations of fishes. But the agency, in its final determination, and had indicated earlier in the EA, and I believe it's at supplemental excerpts page 86, it states that the population of concern with respect to biological resources, which includes fishes, is the regional population. So in the EA, there's not only sentences that address Mr. Childs' concern, but it says that's not the population we're looking at here. We're not looking at localized populations at individual beaches or individual water bodies. We're looking at a much broader scale here, and we're thus considering the regional populations. What's your response to opposing counsel's argument that the range was broadened to avoid having to do an environmental impact statement? In the EIS, the 2003 EIS, MMS considered that it was the larger scale regional population that's at issue, and that's reasonable given that the nature of the analysis being done by the agency, as I said, wasn't localized. It wasn't limited to particular areas. It was looking at the impacts within the Beaufort Sea. There are no artificial boundaries that have been put in place for the lease sales that were being done, and the agency determined that likewise it wouldn't function as if there were artificial boundaries in place that localized the impact. So your argument is it was a reasonable scientific determination? Given the nature of what the agency was looking at, yes, Your Honor. I would just like to take two seconds to address two threshold points that I think will help in the overarching analysis by the court of this case. The first being the nature of MMS's analysis here, the second being the nature of the court's analysis. The review of oil and gas activities that MMS conducts under, pursuant to the Outer Continental Shelf Lands Act is one that occurs in stages, and the review progresses from the point where MMS doesn't have the benefit of being able to base its environmental review on actual proposals for specific activities, and it ranges to the point where MMS actually has very specific information before it that it can analyze. The lease sale stage, which is the scenario that's at issue in this case, represents that earlier scenario when MMS doesn't have, or it's not able to conduct its analysis of potential environmental impacts based on actual particularized activities. So this court must conduct its review bearing in mind that its estimates and projections that govern at this stage. It's later when MMS has specific information before it and therefore can conduct a more specified, particularized NEPA analysis. And the last point is as to the court's review, in the Supreme Court's decision in Marsh v. ONRC, which is a NEPA supplementation case that's quite similar to this one, the court held that the issue of whether an agency decides that supplementation is needed represents a factual dispute that implicates the substantial expertise of the agency. And in such a case, the court must defer to the informed discretion of the agency, and that's indeed the case here. MMS has estimated the oil and gas activities that might occur during this, or as a result of this lease sale. It's looked at the potential environmental impacts, and it's based its estimates on its 30 years or so of managing oil and gas activities in the Outer Continental Shelf. Thank you, counsel. Thank you, Your Honor. I would like to quickly just touch on one issue that was raised by counsel just now, and that was the issue of polar bears. And she just informed the court that in the environmental analysis, MMS did not conclude that there were significant new threats to polar bears. And in fact, that's directly contradicted by the environmental assessment, and that's inaccurate information, and I'll quote from the environmental assessment. MMS stated in that document the impact of a large spill, particularly during the broken ice period, would be potentially significant to the polar bear population. That's what she said, potential. That's the standard. She said that MMS did not find a potentially significant impact, and this is the directly contrary quote where MMS said we are finding it. Fortunately for her, you might have heard it a little different to the court. Okay. What did you hear? I heard her state to the court that MMS did not find in the environmental assessment that there would be a potentially significant impact to polar bears. And what I'm saying is here, what MMS actually concluded in the record is that there would be a potentially significant impact to polar bears, and therefore the agency was required to supplement the EIS because that's significant new information unless the mitigation measures bring that impact below the level of significance. And what I heard opposing counsel say was that, no, the agency never found a potentially significant impact in the first place. Well, the bottom line is we're left with what the record says. Whether or not counsel misguided what the record says, we're left with what the record says. So what does the record say? And this is what the record says in the excerpt of record at page 66. And MMS concluded on the record in the EA to the public, there would be potentially significant impacts to the polar bear population. That's what I thought I heard her say, that there was a potential for. Well, that is the standard under NEPA. So under NEPA, it's not that the impacts will be significant, only that there may be significant. And so I'm sorry if I misunderstood counsel. I thought she had said that there was no potential for significant impact, and that was the conclusion of the agency. So on that point, the record is clear as to what the agency concluded, and that's in the excerpt of record. Here's, I mean, I'm curious as to why you think, I mean, if the agency said that there is a potential impact to polar bears, but these mitigation measures have alleviated any real detriment that would require us to, you know, to update the EA. What's your response to that? So, Your Honor, the mitigation measures have to meet specific requirements per the CEQ regulations and also per the circuit's case law. But keeping in mind that this is not the actual implementation of the lease. This is just the sale. And then once the lease is actually implemented and there's going to be expiration, NEPA kicks in again. And so at that level, you would have the actual, you know, fleshing out of the mitigation measures. So why isn't this enough to articulate the mitigation measures that would be available if and when the expiration actually ensued? So, Your Honor, this is the point in time in which the agency imposes mitigation measures through the leases. On to the purchasers of the leases. So it's through the information to lessee clause and through other provisions of the lease where those mitigation measures are applied to the offshore operators. And so MMS claims that it tried to do that in an information to lessee clause in the lease itself. So it's critical that it happens at this stage. It's a requirement of the lease. And the problem here is that the mitigation measures are only suggestions and recommendations. They're not binding. There's no limitation posed on the activity to protect the polar bear population. It was simply a recommendation that they consider these alternative possibilities. And so that does not meet the requirements of the regulations, CEQ regulations for mitigation. And it also does not meet this Court's prior precedent. All right. Thank you, counsel. Thank you to both counsels for very able arguments. The case just argued is submitted for a decision by the court. The final case on calendar for argument today is Center for Biological Diversity v. Salazar.
judges: Farris, Thompson, Rawlinson